UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COLLIN CORDOVA, *as parent and natural guardian of O.C., and individually*,

Plaintiff,

*– against –*

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

**OPINION & ORDER**

25-CV-03572 (ER)

RAMOS, D.J.:

Collin Cordova ("Cordova"), on behalf of his child, O.C., filed suit against the New York City Department of Education (the "DOE"), under the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act, and the New York State Education Law, seeking pendency and funding for O.C.'s services received for the 2023–2024 school year. Doc. 1. Before the Court are the parties' cross-motions for summary judgment. Docs. 12, 22.

For the reasons stated below, Cordova's motion for summary judgment is GRANTED in part and the DOE's motion for summary judgment is DENIED.

## I. STATUTORY FRAMEWORK

### A. The IDEA

Congress passed the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The statute mandates that any state receiving federal funds must provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A); *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 580 U.S. 386, 390 (2017). The FAPE provided by

the state must include "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and must be "reasonably calculated to enable the child to receive educational benefits." *Endrew F.*, 580 U.S. at 394.

A public school ensures that a student with disabilities receives a FAPE by providing the student with a uniquely tailored Individualized Education Plan ("IEP"). *Endrew F.*, 580 U.S. at 391; *see* 20 U.S.C. § 1401(9). An IEP is a written statement, collaboratively developed by the parents of the child, educators, and specialists, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *M.O. v. New York City Department of Education*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *R.E. v. New York City Department of Education*, 694 F.3d 167, 175 (2d Cir. 2012)).

Because New York State receives federal funds under the IDEA, it must comply with the requirements of the statute. *Walczak v. Florida Union Free School District*, 142 F.3d 119, 123 (2d Cir. 1998). The IDEA further mandates that the FAPE "meet the standards of the State educational agency." 20 U.S.C. § 1401(9)(B). In New York, the task of developing an IEP rests with local Committees on Special Education ("CSEs"), whose members are appointed by the board of education or trustees of the school district. *Walczak*, 142 F.3d at 123 (citing NY Education Law § 4402(1)(b)(1); *Heldman v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992)). "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E.*, 694 F.3d at 175 (citing NY Education Law § 4402(1)(b)(1)(a)). "In developing a child's IEP, the CSE is required to consider four factors: '(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs.'" *E.A.M. v. New York City Department of Education*, No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at * 1

(S.D.N.Y. Sept. 29, 2012) (quoting *Gagliardo v. Arlington Central School District*, 489 F.3d 105, 107–08 (2d Cir. 2007)).

To provide a FAPE, an IEP must be "reasonably calculated to enable the child to receive educational benefits," "likely to produce progress, not regression," and afford the student with an opportunity to achieve greater than mere "trivial advancement." *Cerra v. Pawling Central School District*, 427 F.3d 186, 194, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 129–30). The IEP includes, among other things, "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," and "a description of how the child's progress toward meeting the annual goals . . . will be measured." 20 U.S.C. § 1414(d)(1)(A)(i)(II), (III).

IEPs are "based in significant part on the results of statutorily mandated evaluations of the child." *D.S. By & Through M.S. v. Trumbull Board of Education*, 975 F.3d 152, 157 (2d Cir. 2020) (citations omitted). Specifically, "[u]nder the IDEA, a child with a suspected disability must receive a 'full and individual initial evaluation' to determine the existence and extent of their disability and whether they are entitled to special education and related services under the Act." *Id.* (quoting 20 U.S.C. § 1414(a)(1)). After that initial evaluation, the child is entitled to a "reevaluation" at least once every three years, and not more than once per year—unless otherwise agreed by the parent and school district—"for the purpose of updating their IEP." *D.S.*, 975 F.3d at 157, 157 n.1; *see* §§ 1414(a)(2)(B)(ii), (d)(4)(a). "[A] child's IEP Team must review their IEP 'periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved.'" *D.S.*, 975 F.3d at 157 (quoting § 1414(d)(4)(A)).

"Congress repeatedly emphasized throughout the [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig v. Doe*, 484 U.S. 305, 311 (1988). As a result, states must allow parents "to seek review of any decisions they think inappropriate." *Id.* at 312.

New York State has implemented a two-tiered system of administrative review for disputes regarding "any matter relating to the identification, evaluation or educational placement" of a student with a disability "or the provision of a [FAPE]" to such a student. § 1415(b)(6)(A); *see also* 8 N.Y.C.R.R. § 200.5(i)(1). First, parents who wish to challenge their child's IEP as insufficient under the IDEA may file a due process complaint, requesting an impartial hearing before an Independent Hearing Officer ("IHO"), appointed by the local board of education. *Hidalgo v. Porter*, No. 21 Civ. 10794 (JGK), 2023 WL 8810276, at *2 (S.D.N.Y. Dec. 20, 2023) (citing *Walczak*, 142 F.3d at 122). Either party may then appeal the IHO's decision to a New York State Review Officer ("SRO"), and the SRO's decision can be appealed to either state or federal district court. *Hidalgo v. Porter*, 2023 WL 8810276, at *2 (citing *Walczak*, 142 F.3d at 122–23; 20 U.S.C. §§ 1415(g), 1415(i)(2)(A); NY. Education Law § 4404(2)).

**B. Pendency under the IDEA**

In IDEA proceedings, students have "pendency" or "stay put" rights. The IDEA provides that, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). The purpose of the pendency provision is "to provide stability and consistency in the education of a student with a disability." *Arlington Central School District v. L.P.*, 421 F. Supp. 2d 692, 696 (S.D.N.Y. 2006) (citing *Honig v. Doe*, 484 U.S. 305 (1988)). Pendency "does not guarantee a disabled child the right to remain in the exact same school with the exact same service providers," but rather the "same general level and type of services." *T.M. ex rel. A.M. v. Cornwall Central School District*, 752 F.3d 145, 171 (2d Cir. 2014).

"The term 'then-current educational placement' in the stay-put provision typically refers to the child's last agreed upon educational program before the parent requested a due process hearing to challenge the child's IEP." *Ventura de Paulino v. New York City*

*Department of Education*, 959 F.3d 519, 532 (2d Cir. 2020) (emphasis and citation omitted). To determine a child's "then-current educational placement," Second Circuit courts consider: "(1) the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time when the stay put provision of the IDEA was invoked; or (3) the placement at the time of the previously implemented IEP." *Doe v. East Lyme Board of Education*, 790 F.3d 440, 452 (2d Cir. 2015) (internal quotation marks and citations omitted).

In addition, according to the plain language of the IDEA, the DOE and parents can "otherwise agree" to modify a student's pendency placement at any time, including during a hearing. 20 U.S.C. § 1415(j); *see Ventura de Paulino*, 959 F.3d at 531. A new agreement will supersede pendency created by an IEP, regardless of whether the agreement is memorialized in a new IEP. *L.P.*, 421 F. Supp. 2d at 697. A final administrative decision in favor of a parent's placement creates a *de jure* agreement establishing pendency in the final decision. *Board of Education of Pawling Central School District v. Schutz*, 290 F.3d 476, 484 (2d Cir. 2002); *see also Ventura de Paulino*, 959 F.3d at 532. An IHO's interim order may also serve as the basis of the student's pendency placement in some specific circumstances. *See Avaras v. Clarkstown Central School District*, No. 15 Civ. 9679 (NSR), 2018 WL 4103494, at *5 (S.D.N.Y. Aug. 28, 2018) (finding that an IHO interim order established the student's last agreed-upon placement under the IDEA).

Separate from pendency, "[p]arents who are dissatisfied with their child's education can unilaterally change their child's placement during the pendency of review proceedings and can, for example, pay for private services, including private schooling." *Ventura de Paulino*, 959 F.3d at 526 (internal quotation marks and citations omitted). However, the Supreme Court has held that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *School Committee of Town of*

*Burlington, Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359, 373–74 (1985). After the IEP dispute is resolved, parents may obtain "retroactive reimbursement" from the school district if: "(1) the school district's proposed placement violated the IDEA by, for example, denying a FAPE to the student because the IEP was inadequate; (2) the parents' alternative private placement was appropriate; and (3) equitable considerations favor reimbursement." *Ventura de Paulino*, 959 F.3d at 526–27 (citation and internal quotation marks omitted); *see C.F. ex rel. R.F. v. New York City Department of Education*, 746 F.3d 68, 73 (2d Cir. 2014). The Supreme Court has established this three-pronged test—known as the *Burlington/Carter* test—to determine eligibility for tuition reimbursement.[1]

"Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing. If the board fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184–85 (citing *Cerra*, 427 F.3d at 192).[2] The district court retains discretion over whether to award tuition reimbursement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of [private] enrollment.").

---

[1] The *Burlington/Carter* test is named after two Supreme Court cases: *School Committee of Town of Burlington, Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359, 370, 375 (1985) and *Florence County School District Four v. Carter*, 510 U.S. 7, 15–16 (1993).

[2] "[T]o the extent that a court 'must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise.'" *Reyes ex rel. R.P. v. New York City Department of Education*, 760 F.3d 211, 215 (2d Cir. 2014) (citations omitted).

## II. BACKGROUND

### A. Factual Background[3]

O.C. is a student who has been classified as having a speech language impairment. Doc. 12-3 ¶ 1. In 2019, the CSE evaluated O.C. for a preschool IEP. P17. The IEP dated December 10, 2019 ("2019 IEP") recommended that every week O.C. receive, on a one-on-one basis, ten hours of Special Education Itinerant Teacher Services ("SEIT"), two thirty-minute sessions of occupational therapy, and two thirty-minute sessions of speech-language therapy. *Id.*; Doc. 12-3 ¶ 3.

On September 6, 2021, O.C.'s family challenged the 2021-2022 school year educational program proposed by the district. P14. In response, on June 29, 2022, IHO John Farago issued a Findings of Fact and Decision awarding pendency providing the same services as the 2019 IEP, including ten hours per week of SEIT. Doc. 12-3 ¶ 8; P12; P14.

The following year, on October 25, 2022, O.C.'s family filed a Due Process Complaint regarding the 2019 IEP. P17–18. O.C. continued to receive ten hours per week of SEIT pursuant to the 2019 IEP, until the pendency agreement ended on February 6, 2023. SD2–3.

On February 27, 2023, the CSE issued a new IEP ("2023 IEP"), recommending that every week O.C. receive one thirty-minute session of group counseling services and one thirty-minute session of group speech-language therapy. Doc. 25 ¶ 1. Unlike the 2019 IEP, the 2023 IEP did not recommend any SEIT services. *Id.* ¶ 2. On September 1, 2023, Cordova contracted with a private provider, Children's Resources, to provide O.C.

---

[3] The following facts are drawn from the certified administrative record, which was submitted to the Court in connection with the instant motion, Doc. 28; the parties' Rule 56.1 statements, Docs. 12-3 and 25; and supporting exhibits and pleadings. *See Grim v. Rhinebeck Central School District*, 346 F.3d 377, 380 (2d Cir. 2003) (stating that courts reviewing IDEA cases must "tak[e] into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties"). The facts are undisputed unless noted otherwise. Documents from the certified administrative record are paginated as follows: "SD" refers to the SRO decision, "I" refers to the IHO decision, "P" refers to the Pleadings, "S" refers to the Supplemental Documents, "PE" refers to the Parent [Cordova's] Exhibits, "T" refers to the Transcript, and "CO" refers to the Correspondence.

with ten hours per week of SEIT at a rate of $175 per hour for the 2023-2024 school year. PE21; Doc. 12-3 ¶ 13. However, Cordova testified that O.C. instead received six hours of private services per week, administered virtually via Zoom. Doc. 25 ¶ 5; T157.

Cordova filed a Due Process Complaint dated September 11, 2023. Doc. 25 ¶ 6. Among other things, the complaint requested the services provided in the 2019 IEP be applied to the 2023-2024 academic year, alleged that the DOE failed to provide O.C. with a FAPE, disputed the later-issued 2023 IEP, and requested funding for private services for the 2023-2024 academic year. S1–2. In response to the complaint, on September 28, 2023, the DOE and Cordova took part in a resolution meeting, which was arranged between the parties via email. Doc. 12-3 ¶ 21; S9–11. On January 31, 2024, the CSE declassified O.C. as a student eligible for special education services. Docs. 25 ¶ 9; 12-3 ¶5.

**B. Procedural Background**

In response to the September 11, 2023 complaint, IHO Regina Ritcey conducted an impartial hearing on April 8, 2024, starting at 11:58 a.m. Doc. 25 ¶ 10; T4. At the hearing, Cordova was sworn in to testify. T53–54; *see* Doc. 25 ¶ 10. He asked the purpose of the hearing, and whether it was about continuing services for O.C. T56. The DOE began a direct examination of Cordova by inquiring, "[j]ust earlier you asked what is this regarding, what did you believe this phone call or hearing to be today, if anything?" T58. Cordova responded, "for funding to continue services." *Id.* When the DOE continued with questioning, Cordova stated, "I'm confused about the nature of this hearing," T72, and asked twice whether he was "under investigation." T74, T76. Later, he repeated his question, asking "[a]m I under investigation?" T83.

Subsequently, the IHO asked whether Cordova was aware that his attorney ("Cordova's Attorney" or "Attorney")[4] filed the Due Process Complaint on his behalf. T91. Cordova responded, "[n]o. . . . I was confused about what was going on because I know that we had a meeting back in January . . . [w]e had an IEP meeting." *Id.* The IHO then asked again, "[a]re you aware of this due process complaint that was filed on your behalf, [on] September 11th, 2023?" T92 Cordova twice responded in the negative. *Id.* In response, the DOE moved to dismiss, alleging that Cordova provided inconsistent testimony, and challenging standing because Cordova seemed to be unaware that the Due Process Complaint had been filed on his behalf. *Id.*; Doc. 25 ¶ 11; Doc. 12-3 ¶ 20. Cordova's Attorney opposed the request. T93–94. The IHO noted that she was "not going to dismiss it at this point, although there [were] concerns about the filing of this case." T96.

Then, when the IHO detailed the purpose of the hearing and asked whether Cordova had spoken with his Attorney about the Due Process Complaint, Cordova stated "I don't recall. I don't recall. I don't recall. . . . I'm trying to answer the best I can. . . . I don't remember." T96–97. In response, Cordova's Attorney requested to withdraw the case and refile. T99; Doc. 25 ¶ 12. The IHO stated that because the hearing had commenced, there was no option to withdraw, so she continued the hearing. Doc. 25 ¶ 14; T101.

The IHO then asked Cordova: "[i]s it your testimony that . . . this due process complaint, was filed without your knowledge?" T102. Cordova responded "I don't know. I'm not sure." T102–03. The IHO clarified again, asking whether the complaint was filed without his knowledge, and Cordova answered that he did not "recall filing it or

---

[4] The DOE refers to Mr. Shaya Berger as Cordova's attorney. *See, e.g.*, Doc. 23 at 6. SHO Hauge refers to Cordova's counsel as the firm Gulkowitz Berger LLP, which includes both the attorney who filed the Due Process Complaint and the attorney who represented Cordova at the IHO hearing. *See* SD1; SD4; SD7. Mr. Berger signed the Due Process Complaint, S2, and Ms. Indu Varma, on behalf of Mr. Berger, represented Cordova in the IHO hearing, T5. For the purpose of this opinion, "Cordova's Attorney" or "Attorney" refers to the two attorneys who represented Cordova.

being a part of it, or having it explained." T103. Then, the IHO asked whether he hired his Attorney for a proceeding, and he responded in the affirmative, stating his Attorney was "always in IEP meetings, and with the DOE [was] always . . . the person to represent" him. T103. When asked to clarify the representation again, Cordova stated that he believed his Attorney was "a representative that was appointed" to him through the DOE or the school. T104. The conversation continued and the IHO asked Cordova what he wanted to do about the complaint, to which he responded, among other things, "I want to withdraw [the complaint] and then be able to refile or because, to be honest, I've always been confused with legal proceedings and I've always just had representation or I've just kind of -- to be honest, I just kind of go along with things." T119–120; Doc. 12-3 ¶ 23. In response, the IHO asked again,

> IHO: . . . [Y]ou were not aware that the due process complaint had been filed for your child; is that correct?
>
> Cordova: I'm – I'm not – I'm not aware of that. I'm not -- I -- I don't know what that means.
>
> IHO: The due process complaint means that you, as the parent, let the District know that you were not in agreement with whatever program had been suggested or proposed for your child.
>
> Cordova: Oh, I just -- I wanted to have [O.C.'s] services . . . retained.

T121-22. After this exchange, the IHO decided to continue the hearing. T132.

The DOE continued with the direct examination and asked Cordova whether he agreed with the removal of some services for O.C. in the IEP to be implemented on March 16, 2023. T136–38. In response, Cordova stated,

> No . . . I told them I wanted to continue . . . because during school, I've just gone with what the . . . school said, but . . . for the after school . . . I feel that [O.C. has] definitely benefited. . . . my main fear was that not having [the services] would, you know, make [O.C.] struggle again because I just want [O.C.] to do really well in school, so but you know, a lot of this stuff does, to be honest, it does confuse me. The technical stuff. Like, a lot of it, if you ask me a question, I might not I might not understand the question. I might not know how to answer it.

T139. Then the DOE asked about whether Cordova talked with anyone at Children's Resources and Cordova responded that he didn't recall the conversation but stated, "what I remember is wanting to retain the after school services." T148. Cordova also testified, "I did have a traumatic brain injury when I was 15, and sometimes my memory is really bad, and I am on disability, so I don't know if that's pertinent to this, but I struggle remembering exact [sic]." T148; Doc. 12-3 ¶ 24. The hearing adjourned at 5:37 p.m. T226.

On July 15, 2024, the IHO issued a Findings of Facts and Decision (the "IHO Decision"), applying the *Burlington/Carter* analysis and denying Cordova's request for reimbursement for the privately acquired SEIT services, finding that the DOE provided O.C. with a FAPE, but also awarding compensatory relief for the services other than SEIT that were not provided to O.C. for the 2023-2024 school year. Docs. 12-3 ¶ 18–19; 25 ¶ 16; I4; SD4. The IHO discussed the April 8, 2024 hearing, stating that Cordova denied knowledge of his Attorney's filing of the Due Process Complaint, Cordova's Attorney's request to withdraw, and the DOE's request to dismiss based on Cordova's answers regarding his Attorney's representation. I4–5. The IHO also took judicial notice of Cordova's Attorney's notice of appearance dated September 11, 2023, which stated that the Attorney's firm "was retained by the parents" of O.C. "to represent the parents" in the proceeding. I5. The IHO detailed that during the hearing, she denied the requests to withdraw and dismiss, and continued the hearing. *Id.*

In response to the IHO Decision, on August 26, 2024, Cordova's Attorney filed a request for review to the SRO. Doc. 25 ¶ 17. Cordova's request sought reversal of the IHO Decision due to failure to award pendency, and incorrect application of the *Burlington/Carter* analysis. Doc. 12-3 ¶ 27. Cordova requested ten hours a week of

special education teacher services[5] for the 2023-2024 academic year during pendency, direct funding for private services acquired by Cordova at the rate charged for up to ten hours a week, and other relief. Doc. 25 ¶ 17. On October 25, 2024, the DOE cross-appealed the IHO Decision due to failure to rule on the motion to dismiss in DOE's favor. Docs. 12-3 ¶ 28; 25 ¶ 18. The DOE also wrote in opposition to Cordova's request for review, stating that the *Burlington/Carter* analysis was properly applied, and that O.C. was not entitled to the services Cordova sought. Doc. 12-3 ¶ 29.

In a letter dated October 30, 2024, Cordova's Attorney requested an extension of time to serve an answer to the DOE. CO17. In a letter dated October 31, 2024, an attorney writing on behalf of the SRO granted Cordova's Attorney's extension to respond by November 15, 2024. CO18. On November 15, 2024, Cordova's Attorney answered (the "Answer"), stating that there was standing because his authority to represent Cordova was established by both the relevant legal standard and by Cordova's confirmation of his desire for the representation. Doc. 25 ¶ 19; P44–46.

SRO Carol Hauge issued a decision dated December 30, 2024 (the "SRO Decision"). Doc. 12-3 ¶ 30; SD10. The SRO Decision dismissed Cordova's request for relief based on lack of standing, and reversed the IHO's award of compensatory relief to Cordova for services not provided during the 2023-2024 academic year. Doc. 25 ¶ 22. The SRO concluded that "the threshold issue of standing was not established," because

---

[5] Throughout the record, there is conflation between Special Education Itinerant Teacher Services ("SEIT") and Special Education Teacher Support Services ("SETSS"). For instance, the 2019 IEP includes ten hours a week of SEIT services. P17. The Children's Resources May 2023 Progress Report notes that O.C. is receiving ten hours of 1:1 SETSS services. PE24. However, the September 1, 2023 Agreement for Services with the Children's Resources lists ten hours of SEITS per week, PE21, and the Due Process Complaint requests SEIT services, S1. The Resolution Agreement dated September 28, 2023 states that Cordova is not interested in SETSS services for O.C. but wants O.C. to continue with after school SEIT received via pendency. S8–9. On April 8, 2024, Cordova's Attorney stated that O.C. was receiving SEIT services, T42, but Cordova testified that O.C. received virtual SETSS services. T63. Cordova states that SETSS is the grade-school level equivalent service of preschool level SEITS. Doc. 1 at 5. The DOE states that "SETSS refers to academic support provided to students in a group setting, intended for school-age children, while SEIT refers to holistic support provided to the student on a 1:1 basis throughout the school day." Doc. 23 at 6 n.1. As elaborated further below, the resolution of this dispute is an area in which the SRO's expertise proves necessary. *See R.E.*, 694 F.3d at 189.

Cordova "did not file the . . . September 11, 2023 due process complaint and was unaware that his attorney had done so" and Cordova's Attorney "lacks standing to file a due process complaint on behalf of the student without the parent's knowledge or consent." SD9; Doc. 12-3 ¶ 31. In reaching this conclusion, the SRO acknowledged Cordova's Attorney's notice of appearance, but did not consider Cordova's Answer. SD5; SD9; Doc. 12-3 ¶ 32–34. The SRO Decision stated Cordova submitted the Answer "to the cross-appeal dated November 15, 2024 . . . consequently, the [A]nswer to the cross-appeal was untimely served and will not be considered." SD5. In response to the SRO Decision, on January 2, 2025, Cordova's Attorney requested vacatur. CO27. On January 3, 2025, the SRO denied the request, and stated that while she did not consider Cordova's Answer in reaching her decision, if she had considered it, her decision would have remained the same. CO27–28; Doc. 12-3 ¶ 35.

On April 29, 2025, Cordova appealed the SRO Decision to this Court. Doc. 1. In support of his appeal, Cordova provided an April 26, 2023 retainer agreement which both he and his Attorney signed, and which stated that the Attorney's law firm would "provide legal services relating to and involving the commencement of a Due Process Proceeding against the [DOE] in the New York City Impartial Hearing Office for [O.C.] for the 2023-2024 school year." Doc. 34-1 at 2. A copy of the retainer agreement had not been provided to the IHO or SRO below.

## III. STANDARD OF REVIEW

"Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." *M.H. v. New York City Department of Education*, 685 F.3d 217, 226 (2d Cir. 2012) (alterations in original) (internal citations omitted). The existence of a genuine issue of material fact will not result in a denial. *J.R. v. Board of Education of City of Rye School District*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Instead, a federal court reviewing an administrative decision under the IDEA

bases its decision on an independent review of the record using a "preponderance of the evidence" standard. *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 205 (1982).[6] A federal court will also "tak[e] into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *J.R.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004) (internal citations omitted).

However, "the role of the federal courts in reviewing state educational decisions under the IDEA is 'circumscribed.' Although the district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,' . . . such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review' . . . " *Gagliardo v. Arlington Central School District*, 489 F.3d 105, 112–13 (2d Cir. 2007) (internal citations omitted). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Sherman v. Mamaroneck Union Free School District*, 340 F.3d 87, 93 (2d Cir. 2003) (internal quotation marks omitted) (citing *Walczak*, 142 F.3d at 129).

Cordova argues that this Court should determine for itself whether it supports the SRO's conclusions, because the conclusions pertain to issues of procedural violations, and not to education policy. Doc. 12 at 10–11. The DOE states that Cordova is "arguing that the SRO [D]ecision does not deserve deference because it does address the issues of substantive educational policy." Doc. 23 at 15.

As the Second Circuit has articulated, the level of deference owed by district courts to the administrative findings below must "hinge on the kinds of considerations

[6] In addition to the administrative record, upon either party's request, the Court must also review any supplemental evidence. 20 U.S.C. § 1415(i)(2)(C)(i)–(ii).

that normally determine whether any particular judgment is persuasive." *M.H.*, 685 F.3d at 244. Most critically, the "deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.*, 746 F.3d at 77. The court "must defer to the SRO's decision on matters requiring educational expertise," *R.E.*, 694 F.3d at 189, and the Court's "determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role," *M.H.*, 685 F.3d at 244. Thus, for example:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. . . . Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*M.H.*, 685 F.3d at 244 (internal citations omitted)*; see also Gagliardo*, 489 F.3d at 113 (explaining that "deference to the administrative proceedings is particularly warranted when the district court's decision is based solely on the administrative record.").

The SRO "is empowered to affirm or modify the IHO's order to the extent . . . [he or she] deems necessary." *H.L. v. New York City Department of Education.*, No. 15 Civ. 2451 (LAK), 2016 WL 7429446, at *3 (S.D.N.Y. Dec. 22, 2016) (quotation marks omitted). "[W]here the SRO and IHO agree, '[d]eference to the conclusions of the administrators on this issue is particularly appropriate.'" *C.W. v. City School District of the City of New York*, 171 F. Supp. 3d 126, 131 (S.D.N.Y. 2016) (internal citations omitted); *see F. v. City School District of the City of New York*, No. 15 Civ. 1448 (ER), 2016 WL 1274579, at *10 (S.D.N.Y. Mar. 31, 2016) ("[A]lthough the district court is not prohibited from reversing IHO and SRO decisions that are in agreement, the law in this Circuit counsels strongly against doing so.").

However, where the IHO and SRO disagree, "courts must defer to the reasoned conclusions of the SRO as the final state administrative determination . . . unless [the district court] concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189 (citing *M.H.*, 685 F.3d at 246). "On 'issues of law,' . . . 'such as the proper interpretation of the federal statute and its requirements,' courts owe no deference to state hearing officers." *Board of Education of Yorktown Central School District v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021) (citing *Lillbask ex rel. Mauclaire v. State of Connecticut Department of Education*, 397 F.3d 77, 82 (2d Cir. 2005)).

In the instant case, the IHO and SRO disagree on whether, procedurally, the case must be dismissed for lack of standing, and whether, substantively, Cordova should be awarded compensatory relief for the services other than SEIT that were not provided to O.C. for the 2023-2024 school year. SD10. As the SRO dismissed for lack of standing, she did not provide an opinion on the *Burlington/Carter* analysis, whether Cordova's request for reimbursement for the privately acquired SEIT services should be denied, and whether the DOE provided O.C. with a FAPE. *See id.* Thus, this Court will review the procedural and substantive decisions of the IHO and SRO, applying deference to reasoned conclusions.

## IV. DISCUSSION

Cordova argues that the SRO Decision dismissing the case should be reversed due to procedural and substantive error. Doc. 12 at 4. He argues that the SRO Decision violates procedural due process, as the SRO dismissed the case for lack of standing, and that it was incorrect to decline to consider Cordova's Answer submitted in the appeal. *Id.* Cordova also argues that both the IHO Decision and the SRO Decision were incorrect in that they did not order and enforce O.C.'s pendency placement for the 2023-2024 school year, which according to the 2022 FOFD, included ten hours per week of SEIT. *Id.*; 12-3 ¶ 8; P12; P14. Cordova believes that the IHO decision treated the pendency instead as a

tuition reimbursement claim, incorrectly utilizing the *Burlington/Carter test*. Doc. 12 at 16. Cordova asks that the Court grant summary judgment in his favor and order the DOE to fund the services under pendency. *Id.* at 4.

The DOE asserts that the SRO Decision should be affirmed because it was well-reasoned and supported by the record. Doc. 23 at 6. The DOE argues that Cordova's Attorney did not have authority to bring the case on behalf of Cordova, so the SRO Decision was right to dismiss based on lack of standing. *Id.* In the alternative, the DOE requests that if this Court finds that there is standing, that the Court remand to the SRO to decide the case on the merits, or uphold the IHO Decision. *Id.* at 7.

**A. Procedural Due Process Violation**

The standing requirement "has a core component derived directly from the Constitution[: a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see U.S. v. Hays*, 515 U.S. 737, 742–43 (1995). "As a jurisdictional requirement, standing to litigate cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019).

In IDEA cases, parents have standing to "seek a hearing on any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Winkelman ex rel. Winkelman v. Parma City School District*, 550 U.S. 516, 531 (2007) (citing § 1415(b)(6)(A)) (quotation marks omitted). Otherwise, standing is limited to "certain groups" specified by Congress, including those parties "aggrieved by particular findings or a decision;" otherwise, there is no private right of action in favor of any other entity seeking to challenge a substantive provision of the IDEA. *County of Westchester v. New York*, 286 F.3d 150, 152–53 (2d Cir. 2002).

In the instant case, the SRO found that Cordova "did not file the . . . September 11, 2023 due process complaint and was unaware that his [A]ttorney had done so." SD9.

Accordingly, the SRO ruled that Cordova's Attorney "lack[ed] standing to file a due process complaint on behalf of the student without the parent's knowledge or consent." SD9.

While it is true that a parent's attorney generally lacks standing to pursue an action on behalf of his client without the client's consent, there is no question that parents—including Cordova—have standing to bring IDEA cases. *See Winkelman*, 550 U.S. at 531 (citing § 1415(b)(6)(A)). Thus, finding that Cordova has standing, the Court is confronted the question of whether Cordova knowingly consented to his Attorney filing the Due Process Complaint.

The DOE argues that per CPLR § 322(a), Cordova's Attorney's authority to represent Cordova can be challenged. Doc. 23 at 18. Cordova argues that § 322(a) does not apply to the instant case, because the rule only relates to cases affecting real property. Doc. 12 at 13; Doc. 32 at 7. Further, Cordova argues that he gave full authority to his Attorney to bring the case for him, there exists plenty of evidence that he wanted the proceeding to move forward, and the evidence he provided on the matter was unjustifiably disregarded. *Id.* at 11–12, 14. The DOE argues that Cordova's Attorney did "not successfully establish[] that he is bringing this case on behalf of" Cordova. Doc. 23 at 13.

There is a "'uniform' and 'ancient' presumption that an attorney at law who appears on behalf of a party has the authority to do so." *In re Libyan Asset Recovery & Management Office*, No. 21 Misc. 852 (JGK) (BCM), 2023 WL 8445811, at *8 (S.D.N.Y. Nov. 16, 2023) (citation omitted); *see Osborn v. Bank of U.S.*, 22 U.S. 738, 830 (1824); *In re Tidewater Coal Exchange*, 274 F. 1011, 1014 (S.D.N.Y. 1921), *aff'd*, 280 F. 638 (2d Cir. 1922). The plain language of § 322(a) is that "[w]here the defendant *in an action affecting real property* has not been served with evidence of the authority of the plaintiff's attorney to begin the action, he may move at any time before answering for an order directing the production of such evidence." (emphasis added). So, Cordova is correct

that § 322(a) does not pertain to the instant case, as real property is not at issue. CPLR § 322(a); *cf. Wells Fargo Bank, N.A. v. Chateau*, 36 Misc. 3d 277, 278, 947 N.Y.S.2d 771 (Sup. Ct. 2012) ("[t]he purpose of section 322 is self-evident: to ensure that a defendant is neither dispossessed of their home nor is their interest in their home significantly impaired when the plaintiff landlord/mortgagee does not truly desire such an outcome."); *Raczok v. Capasso*, 32 Misc. 3d 1242(A), 938 N.Y.S.2d 229 (Sup. Ct. 2011) (citations omitted) ("CPLR 322(a) derives from rules and statutes adopted well over a century ago, apparently limited at that time to actions in ejectment. The rule is 'seldom used because where one attorney asks for proof of another's authority, such proof is usually supplied, thus obviating the need for motion practice.'"). *Contra Deutsche Bank National Trust Co. v. McElroy*, 248 A.D.3d 1087, 1087–88, 257 N.Y.S.3d 390 (2d Dep't 2026) (applying § 322(a) to a case involving real property).

The DOE, as the party challenging the authority of Cordova's Attorney, has the burden of proving the representation is unauthorized. *Osborn v. Bank of U.S.*, 22 U.S. 738, 830 (1824); *Danish v. Guardian Life Insurance Co. of America*, 151 F. Supp. 17, 19 (S.D.N.Y. 1957) (citing *Osborn*, 22 U.S. at 830) ("It has long been well settled that an appearance by a practicing attorney creates a presumption that he has authority to act and the law casts the burden of proving the contrary upon the one asserting it."); *Child v. Beame*, 412 F. Supp. 593, 599 n.2 (S.D.N.Y. 1976) (citing *Osborn*, 22 U.S. at 830) ("The general rule is that an appearance by an attorney for a party creates a presumption that the attorney had authority to act on behalf of such party, and the burden of proving the contrary is upon those who challenge the attorney's authority."); *see also In re Taub*, 421 B.R. 93, 104 (Bankr. E.D.N.Y. 2009); *United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO*, 986 F.2d 15, 20 (2d Cir. 1993); *Paulino v. S & P Mini Market Corp.*, 790 F. Supp. 3d 319, 329 n.3 (S.D.N.Y. 2025).

First, the DOE points to documents to prove a lack of attorney authorization: the DOE states that no retainer agreement was provided, and the notice of appearance didn't include an affirmation from Cordova, so didn't prove authorization. Doc. 23 at 14. The notice of appearance dated September 11, 2023, notes that Cordova's Attorney's law firm "was retained by the parents" of O.C. "to represent the parents" in the proceeding. I5. Both the IHO Decision and the SRO Decision acknowledge the notice of appearance. *Id.*; SD9. Given the presumption that an attorney who appears has authority to do so, the DOE's argument that the notice doesn't contain an affirmation from Cordova is not persuasive. *See In re Libyan Asset Recovery & Management Office*, 2023 WL 8445811, at *8; *Danish*, 151 F. Supp. at 19. In any case, Cordova provided the retainer agreement both he and his Attorney signed, dated April 26, 2023. Doc. 34-1 at 2. This retainer agreement predates the filing of the Due Process Complaint on September 11, 2023. *See* Doc. 25 ¶ 6. The letter states that the Attorney will "provide legal services relating to and involving the commencement of a Due Process Proceeding against the New York City Department of Education ('DOE') in the New York City Impartial Hearing Office for [O.C.] for the 2023-2024 school year." Doc. 34-1 at 2. Neither the IHO nor the SRO had the opportunity to review the retainer agreement, as it was submitted for the first time as an exhibit in this Court.[7] However, the document is dispositive in countering any argument that Cordova's Attorney lacked authority.

Second, the DOE points to numerous instances in which Cordova provided testimony that he didn't know about the proceedings and didn't retain his Attorney to represent him in furtherance of the proceedings. Doc. 23 at 17. In particular, the DOE alleges that there exists "overwhelming testimonial evidence that [Cordova] lacked first-hand knowledge" of the Due Process Complaint. *Id.* The SRO listed the testimony in

[7] Cordova notes that prior to the DOE's cross-motion for summary judgment, Doc. 23 at 14, neither the DOE, IHO, nor SRO requested the retainer agreement. Doc. 32 at 5. Cordova's Attorney also provided a declaration stating that Cordova also retained the firm for impartial hearings related to the 2020-2021, 2021-2022, and 2022-2023 school years, which are not at issue in this case. Doc. 12-2 at ¶ 4.

support of this contention, all of which occurred at the IHO hearing on April 8, 2024. *See* SD8. In the hearing, Cordova questioned the nature and purpose of the IHO hearing at least three times, *see* T56, T72, T91, denied knowing or stated he could not remember the filing of the Due Process Complaint at least eight times, T91–92; T96–97; T102–03; T121, and expressed confusion about his relationship with his Attorney, *see* T103–04.

Cordova argues that his confusion can be explained by his lack of understanding of legal terms, his feeling that he was being interrogated aggressively, and his history of a traumatic brain injury and memory issues. Doc. 12 at 11–13; *see* T56; T58; T83; T91; T96–97; T119–22; T139; T148. Further, despite his expressed confusion at the IHO hearing, Cordova still managed to express his desire that O.C.'s services continue, T56; T58; T121–22; T139; T148, and his desire to retain his attorney, T103. Also, outside of the hearing, Cordova attended meetings in furtherance of his desire to retain services for O.C., and communicated via email about his attendance at the meetings. S9; S11.

The record also provides context for Cordova's confusion during the IHO hearing. Cordova's Attorney argues that DOE's questioning was "aggressive." Doc. 32 at 6. Indeed, Cordova asked three times whether he was "under investigation." T74, T76, T83. He expressed confusion about how he could answer questions, stating that he was confused with legal proceedings, and stated that he wanted to be able to withdraw and to "refile." T120, T139. This context, coupled with Cordova's own testimony at the hearing that he suffered from a traumatic brain injury and has lasting memory issues because of it, T148, supports the conclusion that Cordova did authorize his Attorney to file the Due Process Complaint.

Based on the presumption of an attorney's authority, combined with the evidence weighing in favor, the Court finds that the DOE has not satisfied its burden to prove that Cordova's Attorney did not have the authority to file the Due Process Complaint. Most persuasive is the documentation provided—in particular, the retainer agreement—and Cordova's affirmation at several points that he wanted the requested relief. Thus,

Cordova had standing to bring the suit and Cordova's Attorney was properly authorized to represent Cordova.

**B. Substantive Violation**

Cordova alleges that the IHO and the SRO erred in denying his claims for funding the private services for O.C. during the 2023-2024 academic year under pendency. Doc. 12 at 4. While the SRO acknowledged that Cordova appealed for funding of the 2023-2024 academic year pendency, she did not analyze the funding, because she dismissed the case for a lack of standing. SD4; SD9–10. Because the Court finds Cordova did have standing to bring the suit, the appeal for an award of pendency remains. The Court, however, does not have the benefit of the SRO's guidance on this question of educational policy.

District courts highly benefit from the application of the SRO's specialized knowledge and experience. *R.E. v. New York City Department of Education*, 694 F.3d 167, 189 (2d Cir. 2012). Thus, remanding the case to the SRO is appropriate here. *See id.* "While it is true that the Court may consider and defer to the IHO's decision in these circumstances, New York law specifically provides for a two-level system of administrative review. To substitute the IHO's judgment for the SRO's would, in the Court's view, unnecessarily disturb that system." *H.L. v. New York City Department of Education*, No. 15 Civ. 2451 (LAK), 2016 WL 7429446, at *3 (S.D.N.Y. Dec. 22, 2016). The Court thus remands the case to the SRO for analysis of whether to use the *Burlington/Carter* analysis, whether Cordova's request for reimbursement for the privately acquired SEIT services should be denied, and whether the DOE provided O.C. with a FAPE

**C. Consideration of Cordova's Answer**

The only remaining issue ripe for the Court's determination is whether Cordova's Answer was timely filed. Cordova argues that the SRO's exclusion of his Answer constituted a procedural violation. Doc. 12 at 14. Cordova further argues that the SRO's

finding that his Answer was untimely was incorrect, as he was given express permission to file the Answer on November 15, 2024 by an attorney writing on behalf of the SRO. *Id.*; CO18. The DOE later acknowledged that it was "[u]ndisputed" that the Answer "was timely pursuant to an extension granted by an OSR Associate Attorney." Doc. 24 at ¶ 34. Still, the DOE also argues that the Answer was not dispositive, especially in light of the SRO's statement that the Answer would not have had an impact on her decision. Doc. 41 at 6. The Court finds that the Answer was timely filed.

## V. CONCLUSION

For the reasons stated, Cordova's motion for summary judgment is GRANTED in part and the DOE's motion for summary judgment is DENIED. The case is remanded to the SRO. The Clerk of Court is respectfully directed to terminate the motions, Docs. 12, 22, and close the case.

It is SO ORDERED.

Dated: September 28, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.